**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff/Respondent,

v.                                                                        Civ. Case No. 21-170 WJ/KRS
                                                                          Cr. Case No. 15-3394 WJ

FIDAL ABDELJAWAD,

     Defendant/Movant.

**<u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>**

THIS MATTER is before the Court on Defendant/Movant Fidal Abdeljawad's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, filed February 25, 2021. (Doc. 1).[1]  The United States filed a response to the Section 2255 Motion on June 18, 2021, and Mr. Abdeljawad filed a reply on September 16, 2021. (Docs. 11 and 17).  This case has been referred to the undersigned for proposed findings and a recommended disposition of the claims raised in the Section 2255 Motion. (Doc. 19).  Having considered the parties' submissions, the relevant law, and the record of this case and in the underlying criminal case (Criminal Case No. 15-3394), the Court recommends that the claims raised in Mr. Abdeljawad's Section 2255 Motion be denied and this matter be dismissed with prejudice.

**I.**      **BACKGROUND**

     **A.  Criminal Case**

In early 2014, law enforcement authorities began investigating Mr. Abdeljawad and his business, Sean's Smoke Shop, located in Albuquerque, New Mexico, for activities relating to the

---

[1] Citations to (Doc. __) are to documents filed in the Civil Case No. 21-170, and citations to (Cr. Doc. __) are to documents filed in the Criminal Case No. 15-3394.

distribution of synthetic cannabinoids.  (Doc. 1-1) at 7; (Doc. 11) at 1.  On April 14, 2014,

Special Agents Raynaldo Rodriguez and Brian Bridgeford of the Drug Enforcement

Administration ("DEA") used a confidential source ("CS") to purchase synthetic cannabinoids

from Sean's Smoke Shop.  (Doc. 11) at 1.  The CS was provided $20.00 from the agents, driven

to the smoke shop, and searched for money or contraband before entering.  *Id.* at 2.  Once inside

the smoke shop, the CS asked Mr. Abdeljawad for one of the "clear bags," which were what the

agents had been informed Mr. Abdeljawad used to package the cannabinoids.  Mr. Abdeljawad

asked the CS why he asked for that and the CS responded they had previously purchased a "clear

one."  Mr. Abdeljawad asked the CS from whom the CS purchased one, and the CS responded

they did not know the name.  Mr. Abdeljawad told the CS he did not sell that anymore and the

CS exited the smoke shop.  *Id.*

The CS was followed by an unknown man who asked the CS what they wanted from the

store, and told the CS he was "cool" with Mr. Abdeljawad and could purchase the cannabinoids.

The CS provided the man with $10.00, the man re-entered the store, and two minutes later exited

the store.  The man instructed the CS to meet him across the street, and the DEA agents watched

as the CS crossed the street and went to a vehicle the man was driving.  The man asked the CS to

walk a block away so they were not in view of the business, and the agents watched the CS walk

for a block, meet up with the vehicle again, and the man handed the CS a 1.5-gram packet of

"Bizarro," which was a synthetic cannabinoid.  *Id.*; (Doc. 1-1) at 8-9.  The man asked the CS if

he would share the packet, and the CS provided a small amount from the packet to the man.

After the man drove away, the CS entered the vehicle with the agents who searched him for

money and contraband and did not find either.

On April 29, 2014, the CS met with Special Agent Bridgeford to provide information about another alleged purchase of synthetic cannabinoids at Sean's Smoke Shop.  (Doc. 1-1) at 9. The CS told the agent that he took a friend to Sean's Smoke Shop and was able to purchase "spice" through this friend.  The CS stated the friend told the CS that Mr. Abdeljawad would not sell to the friend if the CS entered the business, so the CS handed $10.00 to their friend, who then entered the business.  The friend later returned and provided the CS with a 1.5-gram packet of what was later determined to be "Bizarro."  *Id.*

Based in part upon the information provided by the CS and the purchases of the cannabinoids described above, the agents applied for and received warrants from a state judge in the Second Judicial District Court in Bernalillo County, New Mexico, for the arrest of Mr. Abdeljawad and for the search of his smoke shop, home, and vehicle.  (Doc. 1-1) at 7, 10; (Doc. 11) at 2.  On May 7, 2014, officers executed the warrants, arrested Mr. Abdeljawad, and seized 95 packets of synthetic cannabinoids labeled "Bizarro," "High Life," "Einstein," and "Joker" from the smoke shop; two packets of "Bizarro" and U.S. currency totaling $10,303.00 from Mr. Abdeljawad's van; and $29,882.81 in U.S. currency and a handgun from Mr. Abdeljawad's residence.  (Doc. 1-1) at 10.  On May 8, 2014, based on a tip that Mr. Abdeljawad kept items in a storage unit leased by Ashley Watson, agents visited the storage unit and obtained consent to search the storage unit by Ms. Watson.  The search yielded 549 packets of synthetic cannabinoids labeled "Bizarro," "High Life," "Einstein," "One Hit," and "Zig Zag Lue Juju."  *Id.* Mr. Abdeljawad was released from custody while the state charges were pending.  (Doc. 11) at 3.

In October and November 2014, law enforcement agents in Florida were monitoring the telephone communications of Imad Al-Qattawi pursuant to authorization by a federal judge in the Middle District of Florida.  *Id.*  The agents intercepted calls and texts between Mr. Qattawi

3

and Mr. Abdeljawad in which they discussed trafficking synthetic cannabinoids and the arrest of their associate Ramzi Kahala.  *Id.*  On December 11, 2014, United States District Judge Martha Vazquez authorized the DEA to intercept wire and electronic communications to and from Mr. Abdeljawad's cellular phone for 30 days.  (Doc. 1-1) at 10; (Doc. 11) at 3-4; 16-17.  On January 14, 2015, United States District Judge M. Christina Armijo extended the authorization for an additional 30 days.  (Doc. 11) at 17.  The affidavit supporting the wiretap warrants relied on information from the state search warrants, identified the evidence the DEA seized from Mr. Abdeljawad's business, home, and vehicle, and disclosed that the DEA had admonished the CS and deactivated him as a confidential source.  (Doc. 1-1) at 10-11.

The intercepted calls and texts led to information about Mr. Abdeljawad's possession and continued distribution of synthetic cannabinoids, and on February 19, 2015 the DEA intercepted a parcel from one of Mr. Abdeljawad's suppliers containing 100 packets of synthetic cannabinoids.  (Doc. 11) at 4.  On September 22, 2015, Mr. Abdeljawad was charged by a grand jury indictment with: one count of conspiring to possess and distribute synthetic cannabinoids, in violation of 21 U.S.C. § 846; two counts of possession of synthetic cannabinoids with the intent to distribute on May 7 and May 8, 2014, in violation of 21 U.S.C. § 841(a)(1); and one count of attempted possession of synthetic cannabinoids on February 19, 2015, in violation of 21 U.S.C. § 846.  (Cr. Doc. 29).  Ms. Watson was charged by the same indictment with one count of conspiring to possess and distribute synthetic cannabinoids, one count of possession of synthetic cannabinoids, and one count of attempted possession of synthetic cannabinoids.  *Id.*

Mr. Abdeljawad was arrested on September 29, 2015, and attorney Paul Kennedy began representing Mr. Abdeljawad on October 16, 2015.  (Cr. Doc. 23).  Mr. Kennedy engaged in plea negotiations with the United States from October 2015 through December 2016.  On January 13,

2017, attorney Donald Kochersberger was allowed to substitute as counsel in place of Mr.

Kennedy, and the trial was reset to May 1, 2017.  (Cr. Docs. 55, 61).  The week-long trial

concluded with the jury finding Mr. Abdeljawad and Ms. Watson guilty on all counts.  (Cr.

Docs. 107, 109).  Mr. Abdeljawad re-hired Mr. Kennedy to represent him for the sentencing

proceedings, and Mr. Kochersberger withdrew as counsel on November 7, 2017.  (Cr. Docs. 129,

136).  Mr. Abdeljawad was sentenced on July 19, 2018 to concurrent terms of 132 months

imprisonment as to each of the four counts.  (Cr. Doc. 164, 165).  Mr. Kennedy filed an appeal of

Mr. Abdeljawad's conviction, and the Tenth Circuit allowed attorney Zachary Ives to substitute

for Mr. Kennedy in October 2018, and then attorney Vincent Ward to substitute for Mr. Ives in

February 2019.  (Cr. Doc. 175, 177).  The sole issue raised on appeal was the calculation of the

drug equivalency of synthetic cannabinoids under the U.S. Sentencing Guidelines, and the Tenth

Circuit affirmed the district court's calculations and judgment.  *See United States v. Abdeljawad*,

794 Fed. Appx. 745 (10th Cir. 2019); (Cr. Doc. 178).

### B.  Habeas Petition

In his Section 2255 Motion, Mr. Abdeljawad claims his counsel was ineffective for four

reasons: (1) by failing to investigate, seek discovery, and move to suppress evidence related to

the two search warrants issued by the state court in May 2014; (2) by failing to move to suppress

evidence seized pursuant to the federal wiretap warrant authorized in December 2014; (3) by

failing to seek discovery relevant to the testimony of the government's witness, Ramzi Kahala,

and the alleged supplier, Imad Al-Qattawi; and (4) by failing to request DEA reports regarding

the net weight of synthetic marijuana attributable to Mr. Abdeljawad.  (Doc. 1-1) at 2-6.  He asks

the Court to order the production of discovery, hold an evidentiary hearing, vacate his conviction

and sentence, issue his release from custody, and grant a new trial.  *Id.* at 29-31

In response, the United States disputes that the affidavits supporting the May 2014 search warrants are defective and argues that the state judge had a substantial basis for finding probable cause that evidence of synthetic cannabinoid trafficking would likely be found in Mr. Abdeljawad's smoke shop, residence, and vehicle. (Doc. 11) at 7-16. The United States contends that the admonishment of the CS for involving third parties in the April 2014 purchases did not doom the warrants since the CS's conduct was fully disclosed in the affidavits and the CS was not deactivated until after the warrants were issued. *Id.* at 15-16. The United States similarly disputes that there was any defect in the wiretap warrants issued in December 2014 and January 2015 because they were supported by sufficient facts to establish probable cause even without the evidence seized as a result of the state court warrants. *Id.* at 16-20. Therefore, the United States contends that any motions to suppress evidence obtained as a result of those warrants would have failed, and any defects in the affidavits would be subject to the good faith exception to the exclusionary rule. *Id.* at 12-16.

The United States also argues that Mr. Abdeljawad fails to establish an ineffective assistance of counsel claim with regard to evidence relating to Mr. Kahala because Mr. Abdeljawad's counsel did seek and receive discovery relating to Mr. Kahala's testimony, including his plea agreement and cooperation addendum, a transcript of his grand jury testimony, investigative reports, and data and toll records from Mr. Kahala's telephone. *Id.* at 20-21. The United States argues that Mr. Abdeljawad's counsel was not ineffective for not seeking investigative materials relating to Mr. Qattawi because Mr. Qattawi did not testify at trial and Mr. Abdeljawad's argument that the information might have been relevant is speculative. *Id.* at 21-23. Finally, the United States disputes that Mr. Abdeljawad's counsel was ineffective regarding the estimate of the quantity of synthetic cannabinoids, and notes that his counsel did

6

assert arguments about the quantity estimation in the Sentencing Memorandum and Objections to the Presentence Report, which were considered by the presiding judge in the criminal case. *Id.* at 23-26; (CR Docs. 131, 159).

In reply, Mr. Abdeljawad maintains that his counsel was ineffective for not filing motions to suppress the state search warrants and the federal wiretap warrant based on the credibility of the CS and reliability of the information relating to the April 2014 buys. (Doc. 17) at 5-10. Mr. Abdeljawad also maintains that his counsel should have sought additional evidence about Mr. Kahalah and Mr. Qattawi because it might have been material to his defense, and argues that the formula used to calculate the amount of synthetic marijuana in the seized shipment was flawed and the Court should order the production of DEA records to allow Mr. Abdeljawad to re-calculate the amounts. *Id.* at 10-13.

## II.   LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255, a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Relief is available under Section 2255 only if "the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (citation omitted). The court must presume "that the proceedings leading to the conviction were correct," and the burden is on the petitioner to demonstrate otherwise. *Klein v. United States*, 880 F.2d 250, 253 (10th Cir. 1989) (citing *United States v. Morgan*, 346 U.S. 502, 512 (1954)).

### III.    ANALYSIS

Mr. Abdeljawad brings four ineffective assistance of counsel claims.  It is well established that defendants have a Sixth Amendment right to effective counsel.  *See Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686. Accordingly, the Supreme Court in *Strickland* devised a two-step inquiry to determine whether a lawyer's poor performance deprived an accused of his Sixth Amendment right to assistance of counsel.  *Id.* at 686-87.  In order to establish an ineffective assistance claim, a movant must demonstrate (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense."  *Id.* at 687-88.

Under the first prong, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  *Id.* at 688.  Review of an attorney's performance "must be highly deferential," and the court must "evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  Indeed, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* (citation omitted).  The question to determine deficient performance "is whether [the] representation amounted to incompetence under 'prevailing professional norms,' not  whether it deviated from best practices or most common custom."  *Simpson v. Carpenter*, 912 F.3d 542, 593 (10th Cir. 2018) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)); *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) ("There is a strong presumption that counsel's performance falls within the wide range of professional assistance, the defendant bears the

8

burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.") (citations omitted).

The inquiry does not stop there; rather, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  Under the second prong of the inquiry, the movant must establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*  Courts may analyze either prong first and need only address one prong if the movant fails to make a sufficient showing on that prong. *Id.* at 697.

### A.  Claim One

Mr. Abdeljawad's first claim is that his trial counsel was ineffective by not moving to suppress evidence gathered as a result of the state search warrants.  Mr. Abdeljawad argues the affidavits underlying the state warrants did not provide a "substantial basis for concluding that probable cause existed" to search his business, home, and vehicle for evidence of criminal activity.  (Doc. 1-1) at 17.  Specifically, Mr. Abdeljawad contends the warrant affidavits do not establish probable cause because the April 14, 2014 and April 29, 2014 buys were not sufficiently controlled and used the assistance of unknown third parties, and because the agents did not corroborate the buys. *Id.* at 18-19.  Mr. Abdeljawad also claims that the affidavits do not provide sufficient information about the credibility and reliability of the CS and fail to notify the state judge that the CS had been admonished and deactivated as a confidential source. *Id.* at 19-20.  For these reasons, Mr. Abdeljawad contends his counsel should have moved to suppress the

evidence obtained as a result of these warrants and sought a hearing under *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978).  *Id.* at 22.

The Supreme Court has held that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

> Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like respondent's, a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief.  Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence.

*Id.* at 382.  This is because "[t]he Sixth Amendment does not require that every possible motion be filed, but only those having a solid foundation."  *Coleman v. Brown*, 802 F.2d 1227, 1234 (10th Cir. 1986) (citations omitted); *see also United States v. DeMeulenaere*, 742 Fed. Appx. 367, 370 (10th Cir. 2018) (unpublished) ("If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance."); *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (holding that when the basis for an ineffective assistance of counsel claim is the failure to raise an issue, the court must "look to the merits of the omitted issue").

The Court has reviewed the two search warrants and supporting affidavits that Mr. Abdeljawad alleges are deficient.  *See* (Doc. 1-2) at 29-50 and (Doc. 1-3) at 1-44 (Exhibits C and D).  The warrants describe the places to be searched and property to be seized.  (Doc. 1-2) at 35-36; (Doc. 1-3) at 10-12, 15, 42-44.  The supporting affidavits were prepared and sworn by DEA

10

Task Force Officer Jason Franklin for the smoke shop warrant and by DEA Special Agent Jennifer Fallon for the warrant for Mr. Abdeljawad's home and vehicle.  The warrant for the search of the smoke shop was signed by the state judge on May 6, 2022 and executed on the morning of May 7, 2022.  (Doc. 1-2) at 33.  In the affidavit, Officer Franklin states that since approximately February 2014, he personally participated in the investigation of drug trafficking activities at Sean's Smoke Shop by Mr. Abdeljawad and others.  (Doc. 1-2) at 48-49.  Officer Franklin states that he believes that Mr. Abdeljawad had committed, was committing, and will continue to commit the offenses of trafficking and distribution of controlled substances, based on his "personal participation in the investigation" and statements made "by other law enforcement personnel involved in the investigation, review of reports of other law enforcement personnel and confidential sources" that they "have reviewed and deem to be reliable." *Id.*

Specifically, Officer Franklin states that in February 2014 a confidential source told DEA agents that Mr. Abdeljawad was selling synthetic cannabinoids from Sean's Smoke Shop, and that Mr. Abdeljawad was "very particular about whom he sold 'spice' to and that he preferred to sell 'spice' to young females."  (Doc. 1-3) at 2.  On March 25, 2014, a different confidential source (the CS described above) told Special Agents Raynaldo Rodriguez and Brian Bridgeford that Mr. Abdeljawad was selling synthetic cannabinoids from Sean's Smoke Shop and the CS stated they could purchase spice from the business.  *Id.* at 2-3.  Officer Franklin then describes the April 14, 2014 controlled buy that is discussed above.  He states the CS was provided $20.00 of Officially Advanced Funds, was driven to the location, and was searched for money or contraband.  The CS entered the smoke shop and asked Mr. Abdeljawad from one of the "clear bags."  Officer Franklin explains that agents had previously been informed that Mr. Abdeljawad packaged the product in clear baggies with no markings.  *Id.* at 3.  Mr. Abdeljawad inquired why

11

the CS asked for that and asked the CS from whom they had previously made such a purchase. When the CS did not know the name of the other employee, Mr. Abdeljawad told the CS he did not sell that anymore. *Id.* Officer Franklin then describes the encounter between CS and the unidentified man outside the smoke shop who offered to make the purchase from Mr. Abdeljawad. *Id.* at 3-4. The man told the CS that Mr. Abdeljawad was "cool" with the man, and the man returned to the smoke shop and exited approximately two minutes later. The agents watched the CS meet the man in the vehicle the man was driving and then the CS walked a block away from the smoke shop. *Id.* at 4. The man handed the CS a 1.5-gram packet of "Bizarro" and the CS shared some of it with the man. The CS returned to the vehicle with the special agents and handed the agents the packet. The agents searched the CS for money and contraband and did not find anything else. *Id.*

Officer Franklin next states that on April 21, 2014, two different confidential sources came to the DEA Albuquerque District Office and identified Mr. Abdeljawad as a distributor of synthetic cannabinoids from Sean's Smoke Shop. *Id.* at 4-5. Officer Franklin states that on April 22, 2014, Special Agent Bridgeford attempted to purchase synthetic cannabinoids from Sean's Smoke Shop by asking a female employee for "two of the 1.5s," meaning two of the 1.5-gram packages of synthetic cannabinoid. *Id.* The woman responded that she "didn't have what SA Bridgeford was looking for," and Special Agent Bridgeford "believed she knew what type of product he was referencing" because she did not ask for clarification. *Id.* On April 25, 2014, Albuquerque Police Department Detective Jimmie Jones attempted to purchase synthetic cannabinoids from Sean's Smoke Shop, asking Mr. Abdeljawad for "twenty" of "Bizarro." *Id.* Mr. Abdeljawad asked Detective Jones if he tried the shop down the street and stated he did not have what the detective was looking for.

Finally, Officer Franklin describes that on April 29, 2014, the CS from the April 14, 2014 buy informed Special Agent Bridgeford that the CS was able to purchase "spice" from Sean's Smoke Shop through a friend. *Id.* The CS told the agent that the CS provided the friend a ride to the smoke shop, and the friend said the CS should not enter the smoke shop because Mr. Abdeljawad was "too paranoid." *Id.* at 6. The CS gave the friend $10.00, the friend entered the business, the CS observed the friend and Mr. Abdeljawad talking, and the friend returned after a minute or two and provided the CS with a 1.5-gram packet of "Bizarro" with the label partially torn off. *Id.* The friend told the CS that Mr. Abdeljawad was concerned about the CS sitting in the vehicle so Mr. Abdeljawad tried to tear off the label so it would not show where the bag came from. The CS provided Special Agent Bridgeford with the 1.5-gram bag of "Bizarro," which tested positive for the presence of a federally banned Schedule I substance. *Id.*

The affidavit in support of the search warrant application for Mr. Abdeljawad's home and vehicle is largely identical to Officer Franklin's affidavit. In it, Special Agent Fallon additionally states that on May 7, 2014, an arrest warrant was executed at Mr. Abdeljawad's residence and he was taken into custody, and the search warrant for the smoke shop was executed. *Id.* at 38-39. Special Agent Fallon states that the search of the smoke shop resulted in the seizure of over 100 packages of "Bizarro" and several packages of suspected spice, as well as a bundle of cash. *Id.* at 39. She states that Mr. Abdeljawad's van was in front of his residence and an agent was able to observe through the window of the van "a box containing black mylar bags with pink stickers on them," which the agents believed to be bags of "Bizarro." *Id.* at 40. Special Agent Fallon states that based on her training and experience, it is likely that Mr. Abdeljawad would maintain evidence of drug transactions and sales inside his residence and vehicle. *Id.* She further states that because the vehicle was parked in front of Mr. Abdeljawad's

13

residence, it is believed that evidence of illegal distribution will be located within the residence. *Id.* Based on the information set forth in both affidavits, Task Force Officer Franklin and Special Agent Fallon sought warrants for the smoke shop and Mr. Abdeljawad's home and vehicle. *Id.* at 6-8, 38.

Mr. Abdeljawad contends there was not sufficient probable cause for the state judge to issue the two search warrants because the underlying affidavits relied on a CS who used third parties to make the purchases, the buys were not controlled by the agents, and the agents did not independently corroborate the information provided by the CS. Under the Fourth Amendment, "no [w]arrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend IV. "[P]robable cause exists where attending circumstances 'would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Cantu*, 405 F.3d 1173, 1176 (10th Cir. 2005) (quoting *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001)). The Court accords the judge's determination of probable cause great deference and "asses[es] the sufficiency of a supporting affidavit based on the totality of the circumstances." *Id.* Moreover, "[t]he issuing judge is expected to draw reasonable inferences from information found in the affidavits." *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001).

While the April 14 and April 29, 2014 buys involved unsuspecting third parties and the CS did not directly make the purchases, the buys nevertheless provided information upon which the judge could make reasonable inferences regarding the likelihood of the sale of synthetic cannabinoids inside Mr. Abdeljawad's business. For example, the affidavits do not solely rely on these two buys and instead contain descriptions of multiple confidential sources reporting

14

drug trafficking by Mr. Abdeljawad.  Regarding the April 14, 2014 buy, Mr. Abdeljawad argues that it is "just as likely that the Hispanic male already possessed the packet of synthetic marijuana (and kept it on his person or in his car) as it is that he purchased the packet from the store." (Doc. 1-1) at 19.  However, this does not explain why the third party returned to the smoke shop to purchase a packet of "Bizarro" and then asked the CS to share the purchased packet with him.  Moreover, the agents personally observed the CS purchase the packet of "Bizarro" from the third party that day.  In addition, while the agents were unable to personally make a purchase of synthetic cannabinoids from Mr. Abdeljawad, they nevertheless obtained information indicating Mr. Abdeljawad knew what the officers were attempting to buy but was being careful.  This behavior was consistent with reports that Mr. Abdeljawad was "paranoid" and reluctant to sell to many people.

Mr. Abdeljawad also claims the warrants are deficient because they do not provide sufficient information about the CS's credibility and reliability and failed to notify the state judge that the CS had been admonished and deactivated as a confidential source.  (Doc. 1-1) at 19-20.  Mr. Abdeljawad asks the Court to order the government to produce discovery to determine whether law enforcement knew or had reason to know that the CS was unreliable prior to seeking the search warrants in May 2014 and to hold a hearing to consider the constitutionality of the warrants.  (Doc. 1-1) at 3.  "It is a violation of the Fourth Amendment for an affiant to knowingly and intentionally, or with reckless disregard for the truth, make a false statement in an affidavit." *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001) (citation omitted).  "Where a false statement is made in an affidavit for a [] warrant, the [] warrant must be voided if the affidavit's remaining content is insufficient to establish probable cause." *Id.*  To mandate an evidentiary hearing, "[t]here must be allegations of deliberate falsehood or of reckless disregard

for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

Here, the affidavits supporting the two state search warrants describe in detail the conduct of the CS, but do not mention whether the CS had been admonished or deactivated. Mr. Abdeljawad retained Efren Lapuz, a former DEA agent, to provide opinions concerning the defense provided in this case. (Doc. 1-1) at 3, n.2. Mr. Lapuz opines that the DEA "likely admonished and deactivated the informant before law enforcement sought the warrants in May 2014." (Doc. 1-2) at 4, ¶ 12. The United States responds that the CS was admonished and deactivated "for deviating from instructions" by accepting a third party's offer to make the purchase of the synthetic cannabinoid and sharing the packet with the third party, and then by proceeding without instructions to make a second purchase. (Doc. 11) at 14-15. However, the United States explains that the CS was not deactivated until July 2014. Therefore, the affiants could not have noted the CS was deactivated in the search warrant applications, and the Court finds no error relating to the CS's deactivation.

Mr. Abdeljawad relies on *United States v. Lull*, 824 F.3d 109 (4th Cir. 2016), for his argument that the affiants should have noted the CS was admonished after the buys. In *Lull*, after taking part in a controlled buy, the informant attempted to steal some of the money and drugs purchased during the buy and was arrested on a "felony charge of obtaining property under false pretenses." 824 F.3d at 112. The Fourth Circuit held that this information should have been disclosed to the magistrate judge because "[t]he trustworthiness of the confidential informant lies at the heart of the reliability determination." *Id.* at 117. The holding in *Lull* is distinguishable, however, because the CS here did not engage in behavior nearly as egregious as the informant in *Lull*, and the affiants described all of the CS's conduct in the affidavits. Stated

16

differently, the CS was not admonished or deactivated because of any undisclosed misconduct or dishonesty.

Based on the foregoing, the Court does not find that the affidavits contained deliberate falsehoods or a reckless disregard for the truth.  Again, the judge was provided the details of the CS's conduct and Mr. Abdeljawad provides no offer of proof that the underlying affidavits contained false statements or that the affiants recklessly disregarded the truth.[2]  Therefore, the Court finds that there is no basis to order discovery or hold an evidentiary hearing on this issue. *See Franks*, 438 U.S. at 171 (explaining there is "a presumption of validity with respect to the affidavit supporting the search warrant," and "[t]o mandate a hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine").

In addition, the Court agrees with the United States that even if the state judge lacked probable cause in issuing the warrants, the good-faith exception to the exclusionary rule would apply.  *See* (Doc. 11) at 12-13.  In *United States v. Leon*, 468 U.S. 897, 922 (1984), the United States Supreme Court held that, even if a warrant is not supported by probable cause, evidence seized in good faith in reliance on that warrant is not subject to suppression.  "The exception applies where 'an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'"  *United States v. Rauch*, 282 Fed. Appx. 730, 732 (10th Cir. 2008) (unpublished) (quoting *Leon*, 468 U.S. at 920).  "In determining whether to

---

[2] Mr. Abdeljawad asserts that the "warrant affidavits do not even contain a statement indicating that the [CS] was reliable."  (Doc. 1-1) at 20.  To the contrary, both Officer Franklin and Special Agent Fallon's affidavits state they "deem to be reliable" the reports of law enforcement personnel and confidential sources contained in the affidavits.  (Doc. 1-2) at 48; (Doc. 1-3) at 29.

apply the exception, [the court's] inquiry is 'confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'"  *United States v. Bedolla*, 232 Fed. Appx. 805, 809 (10th Cir. 2007) (unpublished) (quoting *Leon*, 468 U.S. at 922, n.23).  The Supreme Court has recognized "four situations in which an officer would not have reasonable grounds for believing a warrant was properly issued.  In these situations, the good-faith exception to the exclusionary rule would not apply."  *United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000) (citation omitted).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard of the truth.  Second, the exception does not apply when the issuing magistrate wholly abandon[s her] judicial role.  Third, the good-faith exception does not apply when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

*Id.* (citations omitted).

None of the exceptions apply here.  The Court has found that the affidavits did not contain false information or that the affiants had a reckless disregard for the truth.  There is also no support for a finding that the state judge abdicated his judicial role, that the affidavits are lacking in any indicia of probable cause, or that the warrants are so facially deficient that the executing officer could not reasonably believe they were valid.  *See, e.g., United Sates v. Martinez-Martinez*, 25 Fed. Appx. 733, 736 (10th Cir. 2001) (finding the warrant there was not facially deficient because it particularized the place to be searched and the things to be seized).  The officers had reasonable grounds for believing the warrants were properly issued as the affidavit described multiple sources linking Mr. Abdeljawad and his business to the trafficking of

18

synthetic cannabinoids and the personal observations of the agents regarding the CS and their

own attempted buys.  Therefore, "even if the state district judge who issued the search warrant

erred in his probable cause determination, the record firmly establishes that [the affiants were]

acting in good faith when [they] sought the search warrant[s]." *Rauch*, 282 Fed. Appx. at 732;

*see also United States v. Esterline*, 287 Fed. Appx. 693, 698 (unpublished) ("Good faith exists

where there is 'some factual basis connecting the place to be searched to the defendant or

suspected criminal activity.'") (quoting *United States v. Gonzales*, 339 F.3d 1225, 1231 (10th

Cir. 2005)); *Bedolla*, 232 Fed. Appx. at 810 ("[G]ood faith can be established so long as a

minimal nexus exists between the place to be searched and the suspected criminal activity.");

*United States v. McKneely*, 6 F.3d 1447, 1454 (10th Cir. 1993) ("[W]hen reviewing an officer's

reliance upon a warrant, we must determine whether the underlying documents are devoid of

factual support, not merely whether the facts they contain are legally sufficient.")

     For the reasons stated above, the Court finds that Plaintiff's counsel was not ineffective

for failing to file a motion to suppress the state court search warrants.  An attorney does not

provide ineffective assistance of counsel by failing to raise  a meritless claim.  *Florida v. White*,

526 U.S. 559 (1999); *United States v. Cook*, 45 F.3d 388, 392-93 (10th Cir. 1995) (addressed in

context of failure to raise issue on appeal); *United States v. Dixon*, 1 F.3d 1080, 1084, n.5 (10th

Cir. 1991), abrog. on other grounds (same); *United States v. Young*, 862 F.2d 815, 820 (10th Cir.

1989) (counsel not ineffective for failing to file motion to suppress that probably would not have

been granted); *United States v. Stanberry*, 129 F.3d 131 (10th Cir. 1997) (unpublished) (same).

Matters of strategy and tactics are significant in ineffective assistance claims because counsel's

decisions in those areas "are presumed correct, unless they were completely unreasonable, not

merely wrong, so that they bear no relationship to a possible defense strategy."  *Moore*, 254 F.3d

at 1239.  After all, "[u]nlike a later reviewing court, the attorney observed the relevant

proceedings [and] knew of materials outside the record."  *Harrington v. Richter*, 562 U.S. 86,

105 (2011).  Therefore, because a motion to suppress the search warrants was not likely to have

been successful, the Court finds that Plaintiff's counsel's decision not to file a motion to suppress

was reasonable and did not prejudice Plaintiff's case.  The Court recommends denying this

claim.

### B.  Claim Two

Mr. Abdeljawad's second claim is that his counsel was ineffective by failing to

investigate, seek discovery, and move to suppress the federal wiretap warrant issued in

December 2014.  (Doc. 1-1) at 23-25.  Mr. Abdeljawad contends that the wiretap affidavit is

defective because it relies on evidence provided by the CS who was admonished and deactivated

and on evidence seized pursuant to the state search warrants.  *Id.* at 3-4; 23-25.  Mr. Abdeljawad

relies on the "fruit of the poisonous tree" doctrine for this claim, arguing that the evidence

obtained as a result of the defective state search warrants was wrongly used to support the federal

wiretap warrants.  *Id.* at 23.  He contends that, if information that was obtained as a result of the

state search warrants had been excluded, there would not have been sufficient probable cause to

issue the wiretap warrant.  *Id.* at 24.  Mr. Abdeljawad also challenges the sufficiency of the

wiretap warrant affidavit because it did not explain the basis for information relating to

confidential sources' knowledge of Mr. Abdeljawad's drug trafficking activity.  *Id.* at 24.

"The probable cause required for the issuance of a wiretap order is the same as that which

is necessary to obtain the issuance of a search warrant."  *United States v. Carrillo*, 123 F. Supp.

2d 1223, 1253 (D. Col. 2000).  "[T]he judge, reviewing an application for a wiretap, determines

there is probable cause to believe a particular offense has been, is being, or is about to be

committed, and that conversations related to the offense will be overheard." *United States v. Armendariz*, 922 F.2d 602, 607 (10th Cir. 1990). The Court reviewed the wiretap warrant and supporting affidavit. *See* (Docs. 1-5, 1-6) (Exhibit F). The 61-page affidavit supporting the wiretap application was prepared by DEA Special Agent Scott Hartz who states that he personally participated in the investigation of drug trafficking and money laundering activities by Mr. Abdeljawad and others. (Doc. 1-5) at 3.

In the wiretap affidavit, Special Agent Hartz describes the background and known communications between Mr. Abdeljawad and others regarding trafficking synthetic cannabinoids. *Id.* at 5-7. He describes Mr. Qattawi's activities in manufacturing and supplying synthetic cannabinoids for smoke shops in Albuquerque, New Mexico, and states that the information was derived in part from three confidential sources, one of whom is the CS involved in the April 14 and April 29, 2014 buys described in the state search warrants. *Id.* at 14.[3] Special Agent Hartz describes the two buys and adds that the information supplied by CS-3 regarding Mr. Abdeljawad "was independently corroborated by agents and I believe that CS-3 was reliable. However, CS-3 was deactivated as a DEA CS because his relationship with Fidal Abdeljawad was insufficient to further the investigation or to achieve the investigative goals." *Id.* at 16. He further states that "CS-3 was admonished by his handling agent for deviating from instructions" relating to the April 14, 2014 buy, "[m]ore specifically, CS-3 was admonished for utilizing a third-party to conduct the transaction and for sharing a portion of the purchased synthetic cannabinoids what that third party." *Id.* at 18. After describing the April 29, 2014 buy, Special Agent Hartz states that "[s]oon after this purchase, CS-3 was deactivated as a DEA

_____

[3] The CS involved in the April 14 and April 20, 2014 buys is referred to as "CS-3" in the wiretap affidavit.

confidential source after being reprimanded by handling agents for not correctly following instructions." *Id.* at 20.

Special Agent Hartz goes on to describe the May 7, 2014 searches of Mr. Abdeljawad's residence, business, and vehicle; the May 8, 2014 search of the storage locker; and searches relating to other suspects involved in the drug trafficking activities described in the affidavit. *Id.* at 21-24. He then describes in detail wire communications intercepted from Mr. Qattawi as part of a parallel investigation in Orlando, Florida, and explains how these communications demonstrate that Mr. Abdeljawad's drug trafficking activities continued after the May 7 and 8, 2014 searches. *Id.* at 25-39. Special Agent Hartz states that interception of Mr. Abdeljawad's wire and electronic communications is necessary because the investigative methods used thus far (physical surveillance, confidential informants, cooperating sources, undercover officers, search warrants, examination of discarded trash, grand jury or administrative subpoenas, interviews of potential witnesses, and analyses of pen register and trap and trace data and toll records), have not produced sufficient information to successfully dismantle the drug trafficking organization. *Id.* at 39-50; (Doc. 1-6) at 1-7. He also describes Mr. Abdeljawad's efforts at countersurveillance and vigilance in detecting law enforcement activities relating to his activities. (Doc. 1-5) at 45-46. Based on the information set forth in the affidavit, Special Agent Hartz asks the Court to authorize the interception of wire and electronic communications from one of Mr. Abdeljawad's telephones and describes the parameters of the interception sought. (Doc. 1-6) at 7-11.

Mr. Abdeljawad claims his counsel was ineffective for failing to move to suppress evidence obtained from this wiretap warrant for largely the same reasons he argued the state search warrants were defective. (Doc. 1-1) at 23-25. He contends the information supplied by

22

the CS involved in the April 14 and April 29, 2014 buys is not credible because the CS was admonished and deactivated. *Id.* at 24. He also argues that the affiant fails to explain the basis for the information supplied by a different confidential source (described as "CS-1" in the affidavit) or why the affiant finds that source to be credible. *Id.* Finally, he contends that the recorded calls between Mr. Abdeljawad and others "do not come close to establishing that Mr. Abdeljawad was engaged in criminal activity" because they do not explicitly refer to the sale of synthetic marijuana. *Id.*

First, because the Court has found the state search warrants were not deficient, Mr. Abdeljawad's argument that the wiretap warrant should not have relied on evidence obtained pursuant to the state warrants fails. Second, regarding Plaintiff's assertion that the affiant did not provide a basis for the information supplied by CS-1, Special Agent Hartz explains that CS-1 began providing information to the DEA in January 2014 in exchange for financial compensation. (Doc. 1-5) at 14. He describes CS-1's criminal background and states that CS-1 "has experience and knowledge regarding the distribution of synthetic cannabinoids in Albuquerque, New Mexico," "is acquainted with Fidal Abdeljawad and has knowledge regarding Jawad's distribution of synthetic cannabinoids," and "is also acquainted with Imad Qattawi …, has had business and social interaction with Qattawi, and has had the opportunity to discuss synthetic cannabinoids with Qattawi." *Id.* at 14-15. In February 2014, CS-1 provided information about Mr. Qattawi's activities as a source of synthetic cannabinoids, including who Mr. Qattawi replaced as a source and his part ownership in CJ's Smoke Shop. *Id.* at 15. CS-1 described Mr. Qattawi's travels from Florida to Albuquerque, his physical description, and the description and location of Mr. Qattawi's vehicle. *Id.* Special Agent Hartz states he verified the vehicle ownership and location described by CS-1 and that CS-1 provided information about Mr.

23

Qattawi from February 2014 to May 7, 2014, but has not had any known contact or dealings with Mr. Qattawi after the searches conducted on May 7, 2014.  Read in conjunction with information in the affidavit that Mr. Qattawi was believed to be a synthetic cannabinoid manufacturer and distributor based on his intercepted communications, the information provided by CS-1 provides a basis for finding the information provided by CS-1 to be reliable.  *See Tisdale*, 248 F.3d at 970 ("The issuing judge is expected to draw reasonable inferences from information found in the affidavits.").

Finally, the Court addresses Mr. Abdeljawad's argument that the recorded calls between Mr. Abdeljawad and Mr. Qattawi do not provide support for a finding of probable cause to issue the wiretap warrant.  On October 16, 2014, a phone conversation between Mr. Qattawi and Mr. Abdeljawad included the following:

> Mr. Qattawi:  Samih needs something.  I was saying, and you tell me what you think I have not told anything to anyone, we send to Ash so she can make 1/2 dollar per pill.
>
> Mr. Abdeljawad:  You don't get it man, you don't.
>
> Mr. Qattawi: Ah, wrong?  Ah the telephone.  Ok I will come back to you on a different phone.

(Doc. 1-5) at 27.  Special Agent Hartz explains that based on his training, experience, and knowledge of this investigation, the word "pill" is translated from Arabic and is believed to mean packets of synthetic cannabinoids, and "Ash" is Ashley Watson, a girlfriend of Mr. Abdeljawad, employee of his smoke shop, and retail dealer in his drug trafficking organization.  *Id.* at 7, 28. In addition, approximately 17 minutes after that call, another call was intercepted between Mr. Qattawi and Mr. Abdeljawad with Mr. Abdeljawad using a different phone:

> Mr. Abdeljawad:  No problem the other number is only for hello and how are you and [unintelligible] that's it.

24

> Mr. Qattawi:  No, no.  You're right, you are correct.  I wanted to
> ask, I'm saying have Ash [unintelligible] Samih some, needs 1000,
> I will give it to him for 4.  If you want Ash to make some cash on
> the side.

*Id.* at 28-29.  The two proceed to discuss how to deliver the "pills" and the amount that Samih

will pay.  *Id.* at 29-30.  Special Agent Hartz explains this is a continuation of the previous

conversation and Mr. Qattawi was attempting to convince Mr. Abdeljawad to receive synthetic

cannabinoids from him to distribute them to Samih Abu Ghuwaleh through Ashley Watson.  *Id.*

at 30-31.

Special Agent Hartz describes additional calls between Mr. Abdeljawad and Mr. Qattawi

which include Mr. Qattawi asking, "Am I a drug dealer?" followed by laughter, Mr. Abdeljawad

talking about a girl who "deals with drugs" and a man who "wants to sell to my customers," and

the two discussing "Firas, this guy who got caught."  *Id.* at 30, 32-33.  Special Agent Hartz

explains that "Firas" refers to Firas Abuzuhrieh who was arrested on September 22, 2014 on

federal charges for distributing synthetic cannabinoids.  *Id.* at 33-34.  Finally, Special Agent

Hartz describes a conversation where Mr. Abdeljawad and Mr. Qattawi discuss selling to

"jackers" and Mr. Abdeljawad states: "The 1000 I will have you send them tomorrow so I get

them on Monday. … and I will deposit the money the next day."  *Id.* at 35.  Special Agent Hartz

explains that "jackers" is a derivative of the common term for drug users, "junkies."  *Id.*

Based on the foregoing, the Court disagrees that the calls do not support a probable cause

finding.  While Mr. Abdeljawad contends the calls do not establish he was engaged in criminal

activity and do not contain explicit conversations about the sale of synthetic marijuana, probable

cause "requires only a fair probability," it does not "require proof that something is more likely

true than false," and the judge may draw reasonable inferences from the information in the

affidavits.  *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014).  The conversations here contain sufficient information to support a probable cause finding that Mr. Abdeljawad was engaged in drug trafficking activity, especially combined with Special Agent Hartz' explanations derived from his experience and knowledge of the individuals referred to by Mr. Abdeljawad and Mr. Qattawi.  Based on the foregoing, the Court recommends this claim be denied.

### C.  Claim Three

Next, Mr. Abdeljawad claims his counsel was ineffective by failing to request and obtain discovery relevant to Mr. Kahala and Mr. Qattawi.  (Doc. 1-1) at 25-27.  Mr. Abdeljawad states that Mr. Kahala was the government's "star witness" at trial, and testified that Mr. Qattawi supplied Mr. Abdeljawad's smoke shop with synthetic cannabinoids.  *Id.* at 25.  Mr. Kahala testified that he acted as an intermediary for the shipments and received at least six shipments from Mr. Qattawi for Mr. Abdeljawad.  *Id.*  Because of the significance of this testimony, Mr. Abdeljawad argues that his counsel should have moved to obtain information and records related to the government's investigation and prosecution of Mr. Kahala and Mr. Qattawi.  *Id.* at 25-26.  He asks the Court to allow him "to obtain discovery to determine if a *Brady* violation occurred." *Id.* at 26.

In support of this claim, Mr. Lapuz opines that Mr. Abdeljawad's counsel should have requested shipping documents, bank accounts, debriefing reports, surveillance reports, DEA lab analysis reports, search warrant affidavits, photographs, videos, and digital evidence the DEA may have obtained as part of its investigation of Mr. Kahala.  (Doc. 1-1) at 26; (Doc. 1-2) at 10-11, ¶ 26.  Mr. Lapuz states that "these materials could have been used by defense counsel to cross-examine and potentially impeach Mr. Kahala."  (Doc. 1-2) at 11, ¶ 26.  Similarly, Mr. Lapuz opines that Mr. Qattawi appears to have received favorable treatment by the government

26

in exchange for cooperating in the investigation of synthetic marijuana cases, and the interview reports related to Mr. Qattawi's cooperation could have provided material "that could detract from Kahalah's credibility." *Id.* at 12, ¶ 31.  Mr. Lapuz states that this information "could have clarified what shipments were sent to/for Kahalah (and his co-defendant Beirat) and what shipments were sent to /for Mr. Abdeljawad." *Id.*

To provide constitutionally effective assistance of counsel, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The decision "not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Burger v. Kemp*, 483 U.S. 776, 795 (1987).  "Counsel [is] entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Ellis v. Raemisch*, 856 F.3d 766, 784 (10th Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 107 (2011)).  "Limitations of time and money ... may force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence." *Strickland*, 466 U.S. at 681.  Therefore, "[t]hose strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgment on which they are based." *Id.*

Here, the United States asserts that Mr. Abdeljawad's trial counsel requested and received discovery related to Mr. Kahala's prospective testimony pursuant to Fed. R. Crim. P. 16, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500.  (Doc. 11) at 20.  Pursuant to these requests, Mr. Abdeljawad received: Mr. Kahala's plea agreement and cooperation addendum; a transcript of Mr. Kahala's testimony before a grand jury; investigative reports summarizing Mr. Kahala's statements to

27

investigators related to Mr. Abdeljawad; data extracted from Mr. Kahala's telephone; and toll records for that device. *Id.* at 11-12.  Mr. Abdeljawad does not dispute that his counsel received this information, but argues that his counsel should have pursued additional information relating to Mr. Qattawi, who did not testify at the trial.  (Doc. 17) at 3-4.

To establish a *Brady* violation, a defendant must demonstrate that the prosecution suppressed evidence that was favorable to the defendant and was material.  *United States v. Quintanilla*, 193 F.3d at 1139, 1149 (10th Cir. 1999).  Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012).  Mr. Abdeljawad does not identify any evidence that was withheld and, instead, speculates that evidence the DEA may have obtained relating to Mr. Kahala and Mr. Qattawi could have possibly helped his defense.  "The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."  *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995).  Moreover, "[a] *Brady* claim fails if the existence of favorable evidence is merely suspected."  *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).

Mr. Abdeljawad does not make a showing that a *Brady* claim would have been successful or that his counsel was ineffective by not pursuing such a claim.  He also does not provide any support for allowing him to conduct discovery to try to find evidence of a *Brady* claim when he has not specified what evidence he is seeking or how it is material.  *See United States v. Mayes*, 917 F.2d 457, 461 (10th Cir. 1990) ("The constitution does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the government.'") (quoting *Jencks v. United States*, 353 U.S. 657, 667 (1957)).  Additionally, the Court notes that Mr. Abdeljawad's counsel did file a *Brady* motion and motion to suppress

28

regarding Mr. Kahala's telephone and testimony.  (Cr. Doc. 93).  The presiding judge denied the motion, finding that the government turned over all evidence and information it obtained regarding Mr. Kahala's phone and that the evidence was not favorable to Mr. Abdeljawad or material to his defense.  (Cr. Doc. 95).  For these reasons, the Court finds that Mr. Abdeljawad has not established that his counsel was ineffective for failing to pursue additional discovery relating to Mr. Kahala or Mr. Qattawi and recommends that this claim be denied.

### D.  Claim Four

Finally, Mr. Abdeljawad claims his counsel was ineffective by failing to investigate and seek discovery to challenge the Probation Office's estimation of the quantity of drugs he was found to be responsible for in relation to his sentencing.  (Doc. 1-1) at 27-29.  He argues that the Probation Office improperly relied on Mr. Kahala's testimony that Mr. Qattawi sent Mr. Abdeljawad six shipments of synthetic marijuana that likely contained 7,000 net grams of smokable marijuana each.  *Id.* at 27.  The Probation Office arrived at this amount by estimating the amount of smokable marijuana from the shipment that was seized on May 7, 2014 and by relying on Mr. Kahala's testimony that six other unseized shipments contained the same quantity.  Mr. Lapuz states in his affidavit that the actual net weight of the seized shipment could have been more accurately determined by looking at DEA reports for the shipment.  (Doc. 1-2) at 13, ¶ 35.

The Probation Office's Presentence Investigation Report stated the following when estimating the quantity of synthetic cannabinoids that were supplied by Mr. Qattawi to Mr. Abdeljawad:

> During the search of Kahala's home on May 7, 2014, DEA agents seized a Fed Ex box containing hundreds of packets of synthetic cannabinoids near the front door of the residence.  Kahala testified

29

at trial that he received six such shipments of synthetic cannabinoids from Qattawi for Abdeljawad between February to May 2014.  The gross weight of the FedEx parcel seized on May 7, 2014, was 14.8 kilograms.  The DEA agents removed 2 kilograms of the packets from that box and submitted them to the DEA South Central Laboratory for analysis.  The laboratory examination revealed that the two kilogram sample was comprised of 225 packets containing UR-144 or AB-FUBINACA.  Further, the laboratory examination revealed the packets tested contained an average of 5.185 grams of a mixture containing synthetic cannabinoids.  With a reduction of three kilograms for the weight of the box and external packaging, the contents or packets within the box weighed 12 kilograms, containing 7,000 net grams of smokable synthetic cannabinoids.  Based on Kahala's testimony, this appears to have been a typical shipment of synthetic cannabinoids from Qattawi for Abdeljawad.  When multiplied by six shipments, the aggregate quantity of the synthetic cannabinoids supplied by Qattawi (via Kahala) to Abdeljawad from February to May 2014 is estimated to be 42,000 grams.

(Cr. Doc. 116) at 11, ¶ 23.

The United States asserts that this estimate was actually conservative because, while FedEx records confirmed that Mr. Kahala received six shipments from Mr. Qattawi from February 13 to March 15, 2014, supplemental FedEx records show eight additional shipments from Mr. Qattawi from March 20 to May 6, 2014.  (Doc. 11) at 24; (Cr. Doc. 153).  Mr. Abdeljawad's counsel raised objections to the quantity attributable to Mr. Abdeljawad in his Sentencing Memorandum and Objections to the Presentence Report.  (Cr. Doc. 131) at 2-3, 7-9. The presiding judge considered counsel's objections and agreed to exclude the eight additional shipments and estimated the quantity from the six shipments at 38,557 grams of synthetic cannabinoids attributable to Mr. Abdeljawad.  (Cr. Doc. 159) at 14-15.  The presiding judge concluded that "it may extrapolate the weight of the unseized shipments from the seized shipments because … the shipments were part of the same course of conduct."  *Id.* at 14 (citing *United States v. Siyam*, 325 Fed. Appx. 674, 685 (10th Cir. 2009) (unpublished) (finding that

similar pattern of operation was sufficient to support conclusion that same amount was in

unseized duffle bags)); *see also* U.S.S.G. § 2D1.1, n.5 ("[W]here there is no drug seizure or the

amount seized does not reflect the scale of the offense, the Court shall approximate the quantity

of the controlled substance.").  The judge noted this "is a conservative estimate" as the judge

rounded down all decimals, limited Mr. Abdeljawad's responsibility to the six unseized

shipments that Mr. Kahala testified about, and used a lower estimated number of packets per

package than what Mr. Kahala testified to.  *Id.*

     Mr. Abdeljawad relies on *United States v. Weintraub*, 871 F.2d 1257 (5th Cir. 1989) for

his claim that his sentencing should be reopened to recalculate the amount of synthetic

cannabinoids.  (Doc. 1-2) at 28-29.  In *Weintraub*, the government conceded that it failed to turn

over evidence that a witness in prior interviews had estimated that the defendant had purchased a

lower amount of cocaine than what the witnesses testified to at trial.  871 F.2d at 1260-61.

Because the court relied on the witness' trial testimony regarding the amount of cocaine for the

defendant's sentencing, the Fifth Circuit vacated the sentence and remanded for a new

sentencing proceeding.  *Id.* at 1264-65.  In doing so, the Fifth Circuit stated that the information

regarding amount of cocaine that was used to sentence the defendant "came solely from [the

witness's] trial testimony" and "mirrored the very evidence that would have been subject to

impeachment if the prosecution had properly revealed [the witness's] prior inconsistent

statement suggesting that Weintraub distributed a much smaller amount."  *Id.* at 1264.

     The *Weintraub* case is distinguishable because Mr. Abdeljawad has not shown that the

government has any information that a lower amount of synthetic cannabinoids should have been

attributed to him.  Moreover, the judge in this case did not rely solely on Mr. Kahala's testimony

to estimate the quantity of synthetic cannabinoids to use for sentencing.  Instead, the DEA

weighed the seized parcel and used their laboratory to analyze the amount of smokable synthetic cannabinoids in the parcel. *See* (Cr. Doc. 116) at 11, ¶ 23. Mr. Kahala estimated that he received six shipments from Mr. Qattawi for Mr. Abdeljawad, and FedEx records corroborated that six shipments were sent from the same shipping account from Florida (Mr. Qattawi's state of residence) to Mr. Kahala's home in February and March 2014. *See* (Doc. 159) at 12. The Court, therefore, finds that the holding in *Weintraub* is distinguishable as the petitioner there had evidence demonstrating a discrepancy in the amount that was used to sentence him, and the amount used for his sentencing had been based solely on the witness testimony that was called into question.

Based on the foregoing, the Court finds that Mr. Abdeljawad's counsel was not ineffective for failing to seek additional DEA records relating to the shipments sent to Mr. Abdeljawad. The Court notes that under U.S.S.G. § 2D1.1, Mr. Abdeljawad's base offense level of 32 required the government to prove only that approximately 17,964.07 grams of synthetic cannabinoids were attributable to him. *See* (Cr. Doc. 159) at 9. The Court's estimate of 38,557 grams is well above that number and Mr. Abdeljawad makes no showing that additional evidence from the DEA reports would have reduced the attributable quantity to below the threshold amount. Indeed, had Mr. Abdeljawad's counsel obtained the DEA reports, they may have revealed an even higher quantity of seized synthetic cannabinoids or have led the court to consider the eight additional shipments, resulting in an even higher sentence.[4] Given the uncertainty of what additional investigation may have revealed, especially since counsel had

---

[4] If the court had found that the additional eight FedEx shipments received by Mr. Kahala were attributable to Mr. Abdeljawad, that would have raised the total attributable amount of synthetic cannabinoids to 104,883.56 grams, raising the offense level to 38 and resulting in a guideline imprisonment range of 235 to 293 months. *See* (Cr. Doc. 159) at 3; (Cr. Doc. 153).

already objected to the inclusion of the eight additional shipments, the Court gives deference to counsel's reasonable decision not to pursue this investigation. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Burger*, 483 U.S. at 795 (explaining that decisions "not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"). The Court recommends this claim be denied.

## IV.   Evidentiary Hearing

Mr. Abdeljawad requests an evidentiary hearing on his claims. Courts shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). In other words, where the record for a Section 2255 motion "conclusively and expressly belie[s] [Petitioner's] claims," no evidentiary hearing is required. *Machibroda v. United States*, 368 U.S. 487, 495 (1962); *see also In re Lindsey*, 582 F.3d 1173, 1175-76 (10th Cir. 2009) (holding that an evidentiary hearing is not needed if "the district court has concluded that the record does not entitle the prisoner to relief; either the prisoner has failed even to allege facts on which relief could be predicated, or the record conclusively contradicts the prisoner's allegations"). For the reasons discussed above, the Court finds that the record is sufficient to dispose of each of Mr. Abdeljawad's allegations of ineffective assistance of counsel and his allegations do not warrant a hearing.

## V.   Certificate of Appealability

Finally, the Court considers whether Mr. Abdeljawad is entitled to a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(B) (providing no appeal may be taken from a "final order in a proceeding under section 2255" unless the petitioner first obtains a certificate of

appealability).  A certificate of appealability may issue only if Mr. Abdeljawad "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As discussed in these Proposed Findings and Recommended Disposition, the Court has found that Mr. Abdeljawad has failed to make the requisite showing of a denial of a constitutional right. The Court, therefore, recommends not issuing a certificate of appealability.

## VI.    RECOMMENDATION

For the reasons stated above, the Court RECOMMENDS the following:

1. Mr. Abdeljawad's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, (Doc. 1), be DENIED;

2. This matter be DISMISSED WITH PREJUDICE; and

3. A certificate of appealability not be issued.


KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN (14) DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen (14) day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition.  If no objections are filed, no appellate review will be allowed.  Pursuant to Fed. R. Civ. P. 72(b)(2), a party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.**